UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 12-CV-1138 (JFB)

———————————

STANLEY OSBOURNE,

Petitioner,

VERSUS

PHILLIP HEATH,

Respondent.

———————————

**MEMORANDUM AND ORDER**
April 8, 2015

———————————

JOSEPH F. BIANCO, District Judge:

Stanley Osbourne ("Petitioner" or "Osbourne") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. On May 23, 2007, following a jury trial, Petitioner was convicted of first-degree assault (New York Penal Law § 120.10(1)). Petitioner was sentenced to a determinate term of imprisonment of fifteen years and a three-year period of post-release supervision.

In the instant petition, Petitioner alleges three violations of his constitutional rights: (1) the evidence at trial was legally insufficient to establish that he caused substantial physical injury to the alleged victim; (2) the admission of an audiotape of an anonymous caller's statements to a 911 operator violated defendant's right to confront witnesses under the Sixth Amendment; and (3) Petitioner was denied effective assistance of appellate counsel.

For the reasons set forth herein, the Court finds that Petitioner has not demonstrated any basis for habeas relief. The Court, therefore, denies the petition in its entirety on the merits.

I. BACKGROUND

A. Facts

The following facts are taken from the petition, as well as from the state court trial and appellate record.

1. Bonita Osbourne

Bonita Osbourne married Petitioner on August 26, 1995. (T. 970.)[1] Throughout the course of their marriage, Petitioner

---

[1] "T." refers to the trial transcript.

competed in bodybuilder competitions and earned many trophies from these competitions. (T. 975.)[2] However, as the marriage went on, Petitioner and Bonito Osbourne began to have marital problems. (T. 986.) Bonita Osbourne testified that Petitioner accused her of cheating on many occasions, constantly cursed at her and called her degrading names. (T. 986-87.) Bonita Osbourne also testified that when she would go out to dance clubs with her girlfriends, Petitioner would follow her there and make sure she was not unfaithful. (T. 989-90.) Some time during the first week of August 2001, Bonita Osbourne asked Petitioner to leave the house, and they became separated. (T. 995.)

2. August 17, 2001

On August 17, 2001, Petitioner asked Bonita Osbourne to see a marriage counselor with him, and she agreed. (T. 996.) Later that afternoon, Bonita Osbourne got into Petitioner's car believing that Petitioner was taking her to see a marriage counselor. (T. 1000.) Bonita Osbourne testified that, during the car ride, Petitioner took out a tape recorder and played a tape for her to hear. (T. 1001.) She testified at trial that she heard a man's voice on the tape recorder; Petitioner asked her whose voice it was and then threw the recorder at her head. (*Id*.) Petitioner told her, "Bitch, you might as well jump out the car because I'm about to kill you." (*Id*.) Petitioner stopped the car and bit her on her arm, which left a scar. (T. 1003-04.) Bonita Osbourne testified that, after being bitten by Petitioner, she looked down and saw a white handle next to the stick shift in between the front two seats of the car. (T. 1006.) She grabbed the white handle and saw it was a 12-inch knife. (T. 1006, T. 1069.)[3] She then got out of the car, and as she did so, she saw Petitioner had a gun. (T. 1006.)

Outside of the car, Bonita Osbourne looked up at Petitioner and saw that he was struggling with the gun, which appeared to be malfunctioning. (T. 1009.) She saw Petitioner hitting the back of the gun when it would not work. (T. 1010.) She ducked behind the car and looked at Petitioner and saw that the gun was still not working. (T. 1009.) She ran away from behind the car, and heard a horn blowing and saw a man in a brown truck nearby. (*Id*.) She was running towards the truck when she felt Petitioner grab her right shoulder and she saw the gun again. (T. 1011.) Bonita Osbourne testified that her last memory was of struggling with Petitioner while he held a handgun. (*Id*.) She testified that the next time she woke up, she was in the hospital. (*Id*.)

A man named Saeed Arabian testified that he was driving in his truck when he saw a man and a woman "struggling" and saw that the man was holding the woman. (T. 789.) Mr. Arabian testified that the woman was saying, "Please help, please help." (T. 798.) He saw the man pushing the woman towards his car. (T. 811.) Mr. Arabian blew his horn to get the man's attention. (T. 797.) Mr. Arabian then parked his truck at a stop sign and opened his car door. (T. 799.) Before Mr. Arabian put his foot down on the ground, he saw that the man had something in his hand and was pointing it at him. (*Id*.) Mr. Arabian could not recall with specificity

---

[2] Stanley Osbourne's physical fitness in August 2001 was described several times during the course of Petitioner's trial. Bonita Osbourne testified that he was very "cut up" without an "ounce of fat on his body." (T. 975.) A photograph of Petitioner at one of the latest bodybuilding competitions was admitted into evidence and published to the jury. (T. 978.)

[3] However, on cross-examination, Bonita Osbourne acknowledged that the signed statement she had made to a police officer contained no mention of a knife with a white handle. (T. 1081.)

what he saw in the man's hands, but after he saw it he drove away because he was scared. (T. 800.) After Mr. Arabian drove away, he pulled over to the side of the road and called 911. (T. 802.)[4] Mr. Arabian waited for the police to arrive and, when they did, he showed them to the intersection where he saw the man and woman struggling. (*Id.*) When Mr. Arabian returned to the intersection, he saw the woman lying on the ground bleeding. (*Id.*) The man and the car were no longer there. (T. 816.)

### 3. Law Enforcement Response

At approximately 19:29 on August 17 2001, Police Officer Alex McKendry ("Officer McKendry") responded to a call[5] and arrived at the intersection of Cherry Lane and Wildwood Road in Kings Point, New York. (T. 702.) When Officer McKendry arrived on the scene, he saw a "large pool of blood in the middle of the roadway dripping down the road." (T. 704.) A little further up the road, he saw a female with a large amount of blood "pouring down the side of her face and the front of her clothing." (*Id.*) Officer McKendry described the woman as being a "heavier" woman in her thirties. (*Id.*) Officer McKendry approached the woman and saw "a large wound on the top of her head with blood seeping out of it and large amounts of blood down her face and the front of her dress." (T. 705.) Officer McKendry testified that the woman was "in and out of a semiconscious state" and that she was not "really coherent." (*Id.*)

Joshua Charry, a paramedic, received a call to respond to Wildwood Road in Kings Point. (T. 882.) Upon arriving there, he met with Kings Point police officers and found a woman who was sitting against a tree at the side of the road. (T. 883.) He saw the woman had a bandage on the left side of her head and learned that a Kings Point police officer placed it there. (*Id.*) He observed that the woman was sitting in a "daze" and only responded to his questions in "grunts" and "moans." (*Id.*) Mr. Charry then placed the woman on a stretcher, placed a cervical collar around her neck, and loaded her into the ambulance. (T. 885.) Mr. Charry wrote in his report that "patient has soft tissue injury to left temporal area." (T. 946.) During the ride to North Shore University Hospital in Manhasset, the patient woke up and began to "yell and scream and swing and kick." (T. 886.) Mr. Charry testified that the patient became "combative" during the ambulance ride. (T. 915.) Mr. Charry stated that he learned the patient was Bonita Osbourne. (T. 914.)

Detective John Lapine of the Nassau County Police Department's Homicide Squad collected several metal parts at the scene. (T. 1260.) He collected a cartridge, which he described as a "shell casing of a bullet not fired." (T. 1272.) Detective James DiBeneditto with the Forensic Evidence Bureau of the Firearms Identification Section testified as an expert in firearms and was shown the metal parts that Detective Lapine testified about earlier in the trial. (T. 1498.) Detective DiBeneditto testified that the metal pieces recovered at the scene— including a firing pin and a firing pin spring—were from a semiautomatic handgun. (T. 1499-1501.)

### 4. Victim's Medical Treatment

Bonita Osbourne was in the hospital for a week. (T. 1022.) She testified at trial that she had a fractured skull requiring 30 – 40 staples in her head. (T. 1013.) X-rays and

---

[4] The recording of Mr. Arabian's 911 call was played for the jury at trial. (T. 815.)

[5] In addition to Mr. Arabian's call, a second, anonymous caller also called 911 to report the incident. (*See* T. 1142-43.) All of the 911 calls were admitted into evidence at trial and played for the jury.

cat scans were performed on her. (T. 1023.) She was heavily medicated, leaving her sedated. (T. 1013.) Dr. Karen Black is the Chief of the Division of Neurology at North Shore University Hospital Manhasset and testified as an expert in neuroradiology. (T. 1202.) She testified that Bonita Osbourne's injuries included: (1) soft tissue swelling and hematoma overlying the skull (T. 1208.); (2) a brain contusion in the right frontal lobe (*Id*.); and (3) a comminuted fracture on the left side of the temporal lobe (T. 1222.). Dr. Black diagnosed Bonita Osbourne with a nonhemorrhagic contusion and explained this meant "the patient was hit in the left skull and as a result developed trauma to the brain." (T. 1230.) She further stated that Bonita Osbourne suffered a fracture as a result of "blunt force trauma." (*Id*.)

Dr. George DeNoto is a general surgeon at North Shore University Hospital Manhasset and was recognized by the Court as an expert in general surgery. (T. 1360.) Dr. DeNoto reviewed Bonita Osbourne's hospital records and testified to the following: (1) she suffered four lacerations in one area of her skull (T. 1367.); (2) her artery was lacerated (*id*.); (3) "200 milliliters of her blood was lost just in the sheets" (T. 1369); (4) 400 milliliters of blood was lost during the suturing of the arterial laceration (*id*.); (5) Bonita Osbourne required a blood transfusion (T. 1378.); and (6) she suffered a "comminuted skull fracture." (*Id*.) Dr. DeNoto explained, "A fracture is considered comminuted when it's shattered. So there was basically a shattered fracture of the skull underneath the skin laceration." (*Id*.)[6]

---

[6] Dr. Black stated under cross-examination that a blunt force trauma could also result from a 270-pound woman falling and hitting her head on the street; however, Dr. DeNoto testified that when someone falls to the ground and hits their head it "usually manifests as a contusion" and "it's very unlikely for someone to fall on [his/her] head and . . . to suffer a comminuted skull fracture." (T. 1379.)

Dr. DeNoto testified that had Bonita Osbourne not received medical care, she would have died from this injury. (T. 1389.)

Detective Sergeant Steven Zeth of the Nassau County Police Department interviewed Bonita Osbourne at the hospital. (T. 1291.) During the interview, Bonita Osbourne's head was covered with bandages and there was bruising about her face. (T. 1297.) Detective Zeth also testified that her speech was slurred and "very, very labored." (*Id*.) After leaving the hospital, Bonita Osbourne went to a "Safe House" where she experienced headaches that lasted for two months. (T. 1025.)

5. Petitioner's Arrest

On September 11, 2005, Constable Christopher Salmon of the the Peer Regional Police in Brampton, Ontario, Canada arrested Petitioner at 56 Gold Park in the city of Brampton. (T. 1408-1409.) After Petitioner was placed under arrest, Constable Salmon handcuffed him, searched him, read him his rights, and recovered some of Petitioner's property from that Canadian residence. (T. 1409.) The seized property included the following: (1) gym membership card in the name of Leroy Haughton; (2) Ontario driver's license in the name of Leroy Haughton; (3) Canadian social insurance number; and (4) Canadian CIBC Visa Card in the name of Leroy Haughton. (T. 1413.) Constable Salmon testified "these items belong[ed] to Mr. Osbourne" and Constable Salmon seized them from "his bedroom dresser." (T. 1410.) These items were admitted into evidence in addition to two wallets, a set of keys, and banking documents. (T. 1411-12.) At the time Petitioner was arrested, he was using two names, Stanley Osbourne and Leroy Haughton. (T. 1412.)

4

B. Procedural History

1. State Court Proceedings

a. Trial and Sentencing

A grand jury in Nassau County returned an indictment for charges of assault in the first degree (N.Y. Penal Law § 120.10(1)) and assault in the second degree (N.Y. Penal Law § 120.05(2))). Petitioner proceeded to trial by jury on February 26, 2007. (T. 619.) The prosecution presented fourteen witnesses. (T. 1673.) Petitioner did not testify at trial. (T. 1507.) After the prosecution rested, defense counsel moved to dismiss the charges set forth in the indictment "based upon the fact that the People have failed to make out a prima facie case." (T. 1510.) The court, believing there was "legally sufficient evidence to establish the offenses charged," denied the motion. (T. 1511.) After the defense rested, defense counsel moved to dismiss both charges listed in the indictment stating, "the People have failed to prove either of those charges beyond a reasonable doubt as a matter of law." (*Id.*) The court reserved decision. (*Id.*)

At the close of the trial, the court gave the following instructions to the jury:

> Under our law, a person is guilty of assault in the first degree when, with intent to cause serious physical injury to another person, he causes such injury to that person by means of a dangerous instrument . . . Serious physical injury means impairment of a person's physical condition which creates a substantial risk of death or which causes death or serious and protracted disfigurement or protracted impairment of health or protracted loss or impairment of the function of any bodily organ. Dangerous instrument means any instrument, article or substance, including a vehicle which, under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or other serious physical injury.

(T. 1631.) On March 8, 2007, the jury reached a verdict, finding Petitioner guilty of the crime of assault in the first degree. (T. 1667.) Petitioner was sentenced on May 23, 2007. (S. 1.)[7] Judge Jaeger stated he believed Petitioner showed a lack of remorse or empathy for Bonita Osbourne. (S. 24.) The court sentenced Petitioner to a determinate term of fifteen years' imprisonment and three years of post-release supervision. (*Id.*)

b. Appeals

Petitioner, represented by counsel, appealed his conviction to the Appellate Division, Second Department, raising one issue: (1) the evidence at trial was insufficient to establish that Petitioner intentionally caused serious physical injury to the victim. (Appellant's Br. 18-27, December 3, 2008, ECF No. 7-17.)[8]

On December 18, 2008, Petitioner wrote a letter to the Appellate Division seeking permission to file a *pro se* supplementary brief. (Letter dated December 18, 2008, ECF No. 7-15 at 1.) The *pro se* supplemental brief was filed on April 24, 2009 and it raised the following issue: Petitioner's constitutional right to confront witnesses guaranteed under the Sixth Amendment was violated when the trial court allowed a tape-recorded 911 telephone statement to be admitted into evidence (*See* Appellant's Supplemental Br., ECF No. 7-9 at 3-7.)

---

[7] "S." refers to the transcript of the sentencing proceeding held on May 23, 2007.
[8] The Court cites to the page numbers assigned by ECF.

5

In a decision dated January 12, 2010, the Appellate Division, Second Department, affirmed Petitioner's conviction, holding the evidence was legally sufficient to establish Petitioner's guilt beyond a reasonable doubt. *People v. Osbourne*, 69 A.D.3d 764, 765 (N.Y. 2d Dep't 2010). Moreover, the court held that this issue was unpreserved for appellate review. *Id.* The court also ruled that the admission of the 911 telephone call did not violate Petitioner's Sixth Amendment rights because the statements were not testimonial and thus, properly admitted under the present sense impression exception to the hearsay rule. *Id.*

In a letter to the New York Court of Appeals dated March 1, 2010, Petitioner's attorney sought leave to appeal to the Appellate Division's January 12, 2010 decision pursuant to New York Criminal Procedure Law Section 460.20. (Letter dated March 1, 2010, ECF No. 7-4 at 3-5.) On April 22, 2010, the Court of Appeals denied Petitioner's application for leave to appeal. *People v. Osbourne*, 14 N.Y.3d 843 (N.Y. 2010). Petitioner did not seek review before the United States Supreme Court.

On December 17, 2010, Petitioner, acting *pro se*, filed a motion for a writ of error coram nobis in the Appellate Division on the ground that his appellate counsel was ineffective. (Mot. for a Writ of Error Coram Nobis, *People v. Osbourne*, ECF No. 7-14, December 17, 2010.) Petitioner alleged that appellate counsel was ineffective for raising only one issue, which was unpreserved for appellate review, while failing to raise other meritorious issues. (*Id.*) On May 10, 2011, the Appellate Division denied Petitioner's motion, holding that Petitioner failed to establish that he was denied effective assistance of appellate counsel. *See People v. Osbourne*, 84 A.D.3d 979 (2d Dept. 2011). On August 9, 2011 the New York Court of Appeals denied Petitioner's request to appeal from the denial of his motion for a writ of error coram nobis. *People v. Osbourne*, 17 N.Y.3d 820 (N.Y. 2011) (Smith, J).

### 2. The Instant Petition

Petitioner filed a *pro se* Petition for Writ of Habeas Corpus on March 1, 2012. Petitioner raised three grounds: (1) the evidence at trial was insufficient to establish that Petitioner caused substantial physical injury to the alleged victim (Pet. at 5);[9] (2) the conviction was obtained in violation of Petitioner's constitutional right to confront witnesses (Pet. at 6); and (3) Petitioner received ineffective assistance of appellate counsel (Pet. at 8). Respondent filed a memorandum of law in opposition to the petition on May 24, 2012. (Res. Br. 12-28, May 24, 2012, ECF No. 7.)[10] Petitioner did not submit a reply to the opposition. This matter is fully submitted, and the Court has fully considered the submissions and arguments of the parties.

### II. STANDARD OF REVIEW

To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was

---

[9] "Pet." refers to Osbourne's petition filed in this case. (ECF No. 1.) The Court cites to the page numbers assigned by ECF.

[10] "Res. Br." refers to the memorandum of law filed before this Court by Respondent on May 24, 2012. (ECF No. 7.)

adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Additionally, while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist*, 260 F. 3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

III. DISCUSSION

For the reasons discussed below, the Court denies Petitioner habeas relief. Although one of Petitioner's claims is procedurally barred, the Court proceeds to analyze the merits of that claim and concludes it is without merit. The remaining claims also fail on the merits.

A. Procedural Bar

1. Exhaustion

As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida*, 549 U.S. 327, 333 (2007) (citing *Fay v. Noia*, 372 U.S. 391, 435-38 (1963)), petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Daye v. Att'y Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). Exhaustion of state remedies requires that a petitioner "'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)) (quotation marks omitted).

Passage through the state courts, in and of itself, "is not sufficient." *Picard*, 404 U.S. at 275. To provide the State with the necessary "opportunity," the prisoner must

7

fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Duncan*, 513 U.S. at 365-66. "A petitioner has fairly presented his claim only if he has informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir. 2003) (internal quotation and citation omitted). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye*, 696 F.2d at 191. To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Id.* at 192 (footnote omitted).

2. State Procedural Requirements

Like the failure to exhaust a claim, the failure to satisfy the state's procedural requirements will deprive the federal courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (quoting *Coleman*, 501 U.S. at 735) (emphasis omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are . . . to be deemed exhausted." *DiGuglielmo v. Smith*, 366 F.3d 130, 135 (2d Cir. 2004) (per curiam).

Even where a plaintiff properly exhausts his claim, however, exhaustion "does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (citing *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Coleman*, 501 U.S. at 744-51)). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Gray*, 518 U.S. at 162 (citations omitted).

The procedural bar rule in the review of applications for writs of habeas corpus is based on the comity and respect accorded to state judgments. *See House v. Bell*, 547 U.S. 518, 536 (2006). The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Coleman*, 501 U.S. at 730-31.

Once it is determined that a claim is procedurally barred under state rules, a federal court still may review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the

claim will result in a miscarriage of justice. *Id.* at 750. A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To overcome procedural default based on a miscarriage of justice, petitioner must demonstrate that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 537 (quoting *Schlup v. Delo*, 513 U.S. 324, 327 (1995)).

### 3. Application

"The burden of proving exhaustion lies with the habeas petitioner." *Cartagena v. Corcoran*, No. 04-CV-4329 (JS), 2009 WL 1406914, at *3 (E.D.N.Y. May 19, 2009). The Court concludes that Petitioner has not met that burden with respect to one of his claims. As discussed *supra*, Petitioner raised the following issue on direct appeal to the Appellate Division: that the evidence at trial was insufficient to establish that Petitioner intentionally caused serious physical injury to the victim. (*See* Appellant's Br. 18-27, December 3, 2008, ECF No. 7-17.) Petitioner's *pro se* brief added a second ground for appeal: that Petitioner's constitutional right to confront witnesses guaranteed under the Sixth Amendment was violated when the Trial Court allowed a tape-recorded 911 telephone statement to be admitted into evidence (*See* Appellant's Supplemental Br., ECF No. 7-9 at 3-7.) Petitioner's argued a third ground for appeal when he filed a motion for a writ of error coram nobis in the Appellate Division on the ground that his appellate counsel was ineffective. (Mot. for a Writ of Error Coram Nobis, *People v. Osbourne*, ECF No. 7-14, December 17, 2010.) Thus, Petitioner effectively exhausted each of these three claims because he fairly presented these federal constitutional claims to the "highest state court having jurisdiction over them." *Daye*, 696 F.2d at 191 (en banc).

However, Petitioner's sufficiency of the evidence claim is nevertheless procedurally barred from review. In New York, an objection to the legal sufficiency of the evidence takes the form of a motion to dismiss. *People v. Thomas,* 36 N.Y.2d 514, 516 (1975). The motion must be made before the trial court in order for an insufficient evidence claim to be preserved for review, *People v. Bynum,* 70 N.Y.2d 858, 858 (1987), and the motion must be made "at the close of the People's case." *Thomas*, 36 N.Y.2d at 516.

At trial, Petitioner's counsel moved for a trial order of dismissal upon completion of the People's case, on the ground that the People had not made out a *prima facie* case with respect to the counts in the indictment. (T. 1510.) After the Defense rested, Petitioner's counsel similarly made a general motion to dismiss both charges listed in the indictment stating, "[t]he People have failed to prove either of those charges beyond a reasonable doubt as a matter of law." (T. 1511.) Petitioner claimed that there was insufficient evidence to establish Petitioner intentionally caused serious physical injury; however, defense counsel failed to move to dismiss on these specific grounds. Citing to *People v Hawkins*, 11 N.Y.3d 484 (2008), the Appellate Division ruled that Petitioner's "contention that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt is unpreserved for appellate review." *People v. Osbourne*, 69 A.D.3d 764 (2d Dep't 2010). The *Hawkins* court held "general motions" do not preserve an issue as a matter of law. *Hawkins*, 11 N.Y.3d at 492. Given the lack of specificity in defense counsel's motions,

the legal insufficiency claim was unpreserved for appellate review.

Thus, under New York law, this claim cannot be reviewed because it was decided on an independent and adequate state procedural ground. *See Coleman*, 501 U.S. at 729-31. When a state court relies on an independent and adequate state law ground – such as, in this case, failure to preserve the issue for appeal – federal habeas review is foreclosed. *See Glenn v. Barlett*, 98 F.3d 721, 724 (2d Cir. 1996) (finding that failure to preserve issue for appeal was adequate and independent state law ground precluding federal habeas review).

In order for Petitioner to overcome this procedural bar, Petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Petitioner cannot do so in this case. Petitioner has failed to demonstrate cause for his procedural default on the sufficiency claim, nor has he demonstrated prejudice or that a fundamental miscarriage of justice will result if this claim is not reviewed by a federal court. To the extent Petitioner argues that a miscarriage of justice will result because he is actually innocent of assault in the first degree, the Court rejects that argument and finds, as discussed in detail *infra,* that the evidence presented at trial established Petitioner's guilt beyond a reasonable doubt.

In sum, the issue of legal sufficiency of the evidence was unpreserved for appellate review under New York law; consequently, Petitioner's claim is procedurally barred from federal habeas review. In any event, assuming *arguendo* that this claim is reviewable, it is substantively without merit, as set forth below.

B. Merits Analysis

1. Sufficiency of the Evidence Claim

Petitioner claims that the evidence presented at trial was legally insufficient to establish that he caused substantial physical injury to the alleged victim. (Pet. at 5.) For the reasons set forth below, the Court finds that Petitioner's claim is without merit.

a. Legal Standard

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well established. A petitioner "bears a very heavy burden" when challenging evidentiary sufficiency in a writ of habeas corpus. *Einaugler v. Supreme Court of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997) (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)) (internal quotation marks omitted).

A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (quoting *Jackson*, 443 U.S. at 324)); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the

evidence adduced at trial."). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326). Petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Flowers v. Fisher*, 296 F. App'x 208, 210 (2d Cir. 2008) (quoting *Jackson*, 433 U.S. at 324).

b. Application

Petitioner argues that the evidence was legally insufficient to establish that he caused substantial physical injury to the alleged victim. (Pet. at 5.) Petitioner argues that there was no direct evidence that defendant struck the complainant and no one was able to testify as to how the injury actually occurred. (*Id*.) He also maintains "the credible relevant medical testimony was that the injury could just as likely have been caused by a fall." (*Id*.) Therefore, Petitioner argues the evidence convicting him was insufficient.

In New York, a person is guilty of assault in the first degree law when: "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument." N.Y. Penal Law § 120.10. "'Serious physical injury' means physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10). "'Dangerous instrument' means any instrument, article or substance, including a 'vehicle' as that term is defined in this section, which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(13).

Under the standard enunciated in *Jackson*, this Court finds the evidence, taken together, is legally sufficient for a rational jury to have concluded beyond a reasonable doubt that Petitioner was guilty of assault in the first degree.

Although Petitioner emphasizes the lack of direct evidence connecting him to the injury Bonita Osbourne suffered, "a conviction may be based upon circumstantial evidence and inferences based upon the evidence . . . . " *United States v. Strauss*, 999 F.2d 692, 696 (2d. Cir. 1993) (citations omitted). The circumstantial evidence in this case overwhelmingly points to Petitioner intentionally causing the serious physical injury that caused Bonita Osbourne to require emergency medical care. In particular, the jurors heard testimony that (1) during the marriage between Bonita Osbourne and Petitioner, Petitioner accused her of cheating and was suspicious of her activities when she went out with her girlfriends (T. 986, T. 989-90); (2) Bonita Osbourne recently asked Petitioner to move out of the house and become separated (T. 995); (3) Bonita Osbourne was lured into Petitioner's car under the false pretense that they would attend marriage counseling (T. 1000); (4) Petitioner declared his intent to kill Bonita Osbourne in the car (T. 1001); (5) Petitioner bit Bonita Osbourne (T. 1003-04); (6) there was a long, white knife in Petitioner's car (T. 1006.); (7) Petitioner had a gun and it

appeared to be malfunctioning when he repeatedly hit the back of the gun when it would not fire (T. 1010); (8) Saeed Arabian saw a struggle between Petitioner and Bonita Osbourne (T. 789); (9) Saeed Arabian heard Bonita Osbourne say "please help, please help" (T. 798); (10) Saeed Arabian saw Petitioner hold something up at him (T. 799); (11) Saeed Arabain saw Petitioner push Bonita Osbourne back to his car (T. 811); (12) Saeed Arabian immediately called 911 to report what he had seen (T. 815); (13) Bonita Osbourne had a large wound on the top of her head and was in a "semiconscious state" when the police and paramedics arrived (T. 705); (14) a cartridge (described as a "shell casing of a bullet not fired") was collected at the scene of the crime (T. 1272.); (15) metal pieces were collected at the scene of the crime that were parts of a "semiautomatic handgun" (*Id*.); (16) Bonita Osbourne suffered a brain contusion on the right frontal lobe, a comminuted fracture on the left side temporal lobe and this fracture was a result of "blunt force trauma" (T. 1208, T. 1222, T. 1230.); (17) had Bonita Osbourne not received medical care, she would have died from this injury (T. 1389.); and (18) Petitioner was arrested in Canada four years later where he had a gym membership card, an Ontario's driver license and a CIBC Visa card all in the name of Leroy Haughton as well as a Canadian social insurance number (T. 1413.).

Therefore, even absent direct testimony, a rational trier of fact could have concluded based on inferences drawn from this evidence that Petitioner was guilty beyond a reasonable doubt of intentionally causing substantial physical injury to Bonita Osbourne.

Petitioner also argues "the credible relevant medical testimony was that the injury could just as likely have been caused by a fall." (Pet. at 6.) The jury heard testimony from two doctors describing the nature and extent of Bonita Osbourne's injuries. Dr. Black testified that Bonita Osbourne's fracture resulted from blunt force trauma and, under cross-examination, she agreed that blunt force trauma could also result had a heavier woman like Bonita Osbourne fell on her side and hit her head on a flat street. (T. 1232-33.) However, Dr. DeNoto disagreed and testified that, if a heavier woman were to fall on her side, after struggling with someone else, her shoulder would have experienced trauma and not her head. (T. 1394-95.) Moreover, Dr. DeNoto stated that falling on her side could not have caused a comminuted fracture like the one he diagnosed on Bonita Osbourne's skull. (T. 1396-97.)

Petitioner attacks the credibility of Dr. DeNoto as a witness and argues that only Dr. Black's testimony is relevant. However, this claim does not warrant habeas relief. It is well established that a habeas court may neither "disturb the jury's findings with respect to the witnesses' credibility," *United States v. Roman,* 870 F.2d 65, 71 (2d Cir. 1989), nor "make credibility judgments about the testimony presented at petitioner's trial or . . . weigh conflicting testimony." *Fagon v. Bara,* 717 F. Supp. 976, 979 (citing *United States v. Zabare,* 871 F.2d 282, 286 (2d Cir.1989)). Thus, a federal habeas court must "resolve all issues of credibility[ ] in favor of the jury's verdict." *United States v. Reyes,* 157 F.3d 949, 955 (2d Cir. 1998) (citations omitted); *see also Copeland v. Walker,* 258 F. Supp. 2d 105, 120 (E.D.N.Y. 2003) ("credibility determinations are exclusively the domain of the trier of fact.").

In sum, the Court concludes that the evidence was legally sufficient to establish that Petitioner caused substantial physical

injury to the alleged victim given the inferences a rational jury could draw from the evidence, after making its credibility determinations. For the reasons set forth above, this Court finds that Petitioner's claim as to the legal sufficiency of evidence is without merit, and, thus, that the state court did not unreasonably apply federal law in rejecting Petitioner's claim.

2. Right to Confront Witnesses Claim

Petitioner next claims "his constitutional right to confront witnesses guaranteed under the Sixth Amendment of the United States constitutional was violated when the trial court allowed, over objection, a tape-recorded 911 telephone statement to be admitted into evidence." (Pet. at 6.) For the reasons discussed *infra*, this Court disagrees.

a. Legal Standard

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir. 1983). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, a petitioner must "show that the error deprived her of a *fundamentally fair* trial." *Id.* (emphasis in original) (citations omitted).

To constitute a denial of due process under this standard, the erroneously admitted evidence must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir. 1992)); *see also Collins v. Scully,* 755 F.2d 16, 19 (2d Cir. 1985) (holding that evidence must be "crucial, critical, highly significant"). In making this due process determination, the Court should engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *See Davis v. Strack,* 270 F.3d 111, 123-24 (2d Cir. 2001).

"The Confrontation Clause of the Sixth Amendment, which applies to the states through the Fourteenth Amendment, guarantees the defendant in a criminal prosecution the right to confront the witnesses against him." *Henry v. Speckard,* 22 F.3d 1209, 1214 (2d Cir. 1994) (citation omitted). Thus, the Confrontation Clause prohibits the prosecution from introducing "testimonial" statements by a non-testifying declarant unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington,* 541 U.S. 36, 53-54 (2004); *see also Davis v. Washington,* 547 U.S. 813, 821 (2006) ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 827.

b. Application

As a threshold matter, the trial court's evidentiary ruling was not erroneous under New York State law because the tape-recorded 911 telephone call was not a testimonial statement. When Petitioner raised this claim on direct appeal, the Appellate Division held that the anonymous 911 tape recording was properly admitted into evidence under the present sense

impression exception to the hearsay rule. *People v. Osbourne*, 69 A.D.3d 764 (2d Dep't 2010). It ruled "the call was made substantially contemporaneously with the caller's finding of the injured complainant" and that the "substance of the call was sufficiently corroborated by other evidence." *Id*. The Appellate Division's ruling was consistent with well-established precedent in New York, and Petitioner has offered no basis for questioning the application of that precedent to the circumstances of his case. *Id.* (collecting cases). Accordingly, the Court concludes that the 911 call was not erroneously admitted under New York law.

Additionally, the Court holds that the 911 call was properly admitted under federal law and did not result in the deprivation of a constitutional right, because the admission of the call did not violate Petitioner's constitutional right to confront witnesses. The person making the 911 call was seeking to resolve the ongoing emergency between Petitioner and Bonita Osbourne. Applying *Davis v. Washinton* here, it is clear that the statement made to the 911 operator was not testimonial, and thus properly admitted, because it was made as "events . . . were actually happening" and made for the purpose of resolving an "ongoing emergency." 547 U.S. at 827-28. Statements made to 911 operators are ordinarily not testimonial because the call "is ordinarily not designed primarily to establish or prove some past fact but to describe current circumstances requiring assistance." *Id*. at 827. The anonymous person who made the 911 call "appeared to be under the impression the victim had been struck by a car, reporting that the victim was bleeding profusely and needed immediate medical attention." (Res. Br. at 11.)[11]

Therefore, because the 911 statements were not testimonial and were made in response to an ongoing emergency, the admission of this evidence was not erroneous under New York law, and Petitioner was not denied his constitutional right to confront witnesses under the Sixth Amendment.

### 3. Ineffective Assistance of Appellate Counsel Claim

Petitioner argues that he was denied effective assistance of appellate counsel because (1) his attorney's brief was inadequate given that he raised only one issue on direct appeal which was unpreserved for appellate review, and (2) his attorney failed to raise other meritorious issues—specifically, that his attorney declined to bring forth an ineffective assistance of trial counsel claim, never raised the issue that the level of injury the victim suffered was not "serious physical abuse," and did not call a medical expert to rebut the prosecution's expert medical witnesses. (Mot. for a Writ of Error Coram Nobis, *People v. Osbourne*, ECF No. 7-14, December 17, 2010.) Having carefully reviewed the record, this Court rejects Petitioner's ineffective assistance of counsel claim and finds no basis for habeas relief on this ground.

#### a. Legal Standard

A criminal defendant has the right to the effective assistance of counsel on the direct appeal of his conviction. *See Evitts v. Lucey,* 469 U.S. 387, 395-96 (1985). In determining whether appellate counsel has rendered constitutionally effective assistance, courts will apply the standard

---

[11] The trial record only shows that the anonymous 911 call was played for the jury and admitted into evidence. The contents of that call are not listed in the record. (*See* T. 1142- 1143.) However, Petitioner does not dispute Respondent's description of the call in Respondent's brief.

established in *Strickland v. Washington,* 466 U.S. 668, 687-96 (1984), for analyzing such claims as to trial counsel. *See, e.g., Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir. 1994) (citing *Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir. 1992)). Under the *Strickland* standard, Petitioner, alleging ineffective assistance of appellate counsel, must prove both (1) that appellate counsel's performance was objectively unreasonable, and (2) that, absent counsel's deficient performance, there was a reasonable probability that Petitioner's appeal would have been successful. *See Mayo,* 13 F.3d at 533-34; *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir. 2001).

Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins,* 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes,* 463 U.S. 745 (1983)); *see also Strickland,* 466 U.S at 690-91 (noting that appellate counsel's strategic choices with regard to which claims to bring on appeal are "virtually unchallengeable"). As the Supreme Court has noted, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986) (quoting *Jones,* 463 U.S. at 751-52).

The first prong requires a showing that counsel's performance was deficient. However, the concept of "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of trial counsel's actions under all circumstances, keeping in mind that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Greiner,* 417 F.3d at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Greiner,* 417 F.3d at 319 (quoting *Strickland*, 466 U.S. at 691). Thus, reviewing courts should not "second-guess" the reasonable professional judgments of appellate counsel as to the most promising appeal issues. *Jones,* 463 U.S. at 754. Instead, as the Second Circuit has observed:

> [T]he district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.

*Mayo,* 13 F.3d at 533 (quoting *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986)).

The second prong focuses on prejudice to the defendant. The defendant is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that it "undermines confidence in the outcome." *Pavel v. Hollins,* 261 F.3d 210, 216 (2d Cir. 2001)

(quoting *Strickland,* 466 U.S. at 694). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole,* 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland,* 466 U.S. at 695) (alteration in original).

This Court proceeds to examine each prong in turn, keeping in mind that a *habeas* petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin,* 366 F.3d 95, 100 (2d Cir. 2004). As set forth below, Petitioner's claim fails to satisfy either element.

b. Application

i. Inadequacy of Brief Filed

As a threshold matter, the Court notes that Petitioner's ineffective assistance of appellate counsel claim was rejected by the Appellate Division in Petitioner's motion for a writ of error coram nobis. The Appellate Division, citing *Jones v. Barnes,* 463 U.S. 745 (1983) and *People v. Stultz,* 2 N.Y.3d 277 (N.Y. 2004), found that Petitioner "failed to establish that he was denied the effective assistance of appellate counsel." (Mot. for a Writ of Error Coram Nobis, *People v. Osbourne*, ECF No. 7-14, December 17, 2010.) Thus, the claim is properly exhausted, but is without merit for the reasons discussed below.

The brief submitted by Petitioner's appellate counsel to the Appellate Division was a well-reasoned, twenty-seven page document, summarizing over one thousand pages of trial transcripts, and emphasizing the one point counsel deemed most likely to succeed. Specifically, as noted *supra*, the one argument raised on appeal was that the evidence at trial was insufficient to establish that the Petitioner intentionally caused substantial physical injury to the victim. Petitioner argues that appellate counsel was ineffective for raising this issue considering it was unpreserved for appellate review. However, appellate counsel realized the issue was unpreserved but he argued, "[p]ursuant to CPL § 470.15(6)(a) even when an issue for appeal is unpreserved as prescribed by CPL § 470.05(2) during the course of trial, as a matter of discretion in the interest of justice, the [Appellate Division] may reverse or modify the judgment."[12] (Appellant's Br. 18-27, December 3, 2008, ECF No. 7-17.)

This was not oversight on the part of Petitioner's appellate counsel nor was it ineffectiveness. Petitioner's counsel recognized that, even if an issue is unpreserved for appellate review, the Appellate Division has the discretion to modify or reverse the judgment and exercise review over the issue. Petitioner's counsel evidently thought this was the strongest issue to raise on appeal and he supported his argument with eleven pages of factual citations to the trial record. Petitioner's counsel argued the Appellate Division should exercise their discretion; nevertheless, given the discussion above, the Appellate Division declined to use their discretion and ruled the evidence was sufficient.

---

[12] New York Criminal Procedure Law § 470.15 is entitled, "Determination of appeals by intermediate appellate courts; scope of review." Section 470.15(6)(a) states: "[t]he kinds of determinations of reversal or modification deemed to be made as a matter of discretion in the interest of justice, include, but are not limited to, the following: [t]hat an error or defect occurring at a trial resulting in a judgment, which error or defect was not duly protested at trial as prescribed in subdivision two of section 470.05 so as to present a question of law, deprived the defendant of a fair trial." N.Y. Criminal Procedure Law § 470.15(6)(a) (McKinney's 2012).

It was not objectively unreasonable for Petitioner's appellate counsel to pursue the strategy he employed. Under the standard of "heavy" deference that this Court must give to judgments made by counsel, *Greiner*, 417 F.3d at 319 (quoting *Strickland*, 466 U.S. at 691), the attorney's appellate strategy was not an unreasonable decision. As set forth below, Petitioner failed to show there was a reasonable probability that his appeal would have been successful had appellate counsel raised other issues on appeal.

### ii. Failure to Raise Other Meritorious Issues

The Court finds that Petitioner's claim that he did not receive effective assistance of counsel because his attorney failed to raise other meritorious issues in his appeal lacks merit. In particular, Petitioner asserts that the meritorious issue that appellate counsel failed to raise was the ineffectiveness of trial counsel based on the following grounds: (1) failure to obtain the services of a medical expert for the defense; (2) failure to call Dr. Gabalski, whose report Petitioner attaches to his petition, to rebut the prosecution's expert medical witnesses; and (3) failure to raise the issue that the level of injury suffered by the victim was not a serious physical injury. (Mot. for a Writ of Error Coram Nobis, *People v. Osbourne*, ECF No. 7-14, Dec. 17, 2010.) Thus, Petitioner argues, the failure to rebut the prosecution's expert medical testimony rendered trial counsel ineffective and similarly, appellate counsel's failure to raise this argument rendered him ineffective.

As in the case of appellate counsel's own effectiveness, the *Strickland* test applies in the context of ineffective assistance of trial counsel. As indicated below, because this Court cannot find that trial counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," appellate counsel properly declined to argue on appeal that trial counsel had been ineffective. *Strickland,* 466 U.S. at 686. Moreover, appellate counsel's strategic choices with regard to which claims to bring on appeal are "virtually unchallengeable." *Id.,* at 690-91. In the instant case, counsel's decision to omit a claim of ineffective trial counsel on appeal did not "fall outside the wide range of professionally competent assistance" and, therefore, cannot form the basis of a claim for ineffective appellate counsel under the Sixth Amendment. *Mayo,* 13 F.3d at 533. Moreover, petitioner cannot show under the standard set forth in *Strickland* that appellate counsel's failure to raise the claim was "objectively unreasonable" or that, if raised, "there was a reasonable probability that [his] appeal would have been successful." *Id.* at 533-34.

A review of the trial record demonstrates that Petitioner's trial attorney acted as a persistent advocate on behalf of Petitioner. At trial, Petitioner's counsel thoroughly cross-examined the prosecution's witnesses, moved to dismiss pursuant to Criminal Procedure Law Section 290.10, and gave a reasoned closing statement. (T. 723-54, 818-77, 889-20, 1031-1113, 1153-68, 1231-48, 1288-92, 1311-34, 1389-1405, 1414-25, 1440-42, 1501-06, T. 1510-11, T. 1534-69.) In short, Petitioner's trial attorney conducted a thorough and highly competent defense. Although counsel did not obtain services of a medical expert to testify for the defense, he thoroughly cross-examined each medical expert the prosecution called. In doing so, Petitioner's trial counsel unequivocally challenged the issue of whether or not Petitioner intended to cause serious physical injury. Petitioner's trial counsel comprehensively questioned both Dr. Black and Dr. DeNoto about their diagnoses. Under cross-examination, Dr. Black testified

that Bonita Osbourne's injury could have been caused by falling and hitting her head on the flat street surface. (T. 1231.) Trial counsel pressed Dr. Black on this issue and she testified that if a 270 pound person, similar to the weight of Bonita Osbourne, was struggling with someone and fell to the ground landing on her head, the same kind of fracture would result. (T. 1232.) Dr. Black acknowledged that, if a heavier woman were to fall on her head, the diagnosis would be blunt force trauma, the exact diagnosis Dr. Black formed regarding Bonita Osbourne's scans. (T. 1233.) Dr. Black even testified that she could not identify the source of the blunt force that caused Bonita Osbourne's injury, only that the injury was consistent with being hit in the head with an object or falling to the ground and hitting the head on a flat surface. (T. 1234.) Trial counsel effectively persisted in this line of questioning to demonstrate to the jury that there was not enough evidence to show that Petitioner intentionally caused this serious physical injury or even that the injury was a serious physical one.

Moreover, although Petitioner argues that his trial counsel was ineffective because he failed to call Dr. Gabalski to testify, Petitioner's counsel questioned one of the prosecution's medical experts about the diagnoses Dr. Gabalski formed. (*Id.*) There is no basis to second guess Petitioner's counsel's strategic decision not to call Dr. Gabalski to testify. Regardless, Dr. Gabalski's diagnoses were placed on the record when trial counsel questioned Dr. DeNoto. (T. 1404.) Therefore, this claim is plainly without merit.

Additionally, Petitioner contends that another meritorious issue appellate counsel omitted was Petitioner's Sixth Amendment right to confront witnesses regarding the tape-recording of the statement made to the 911 operator. For the reasons discussed *supra*, this claim is patently without merit and, thus, appellate counsel was not ineffective for declining to raise this issue.

The Court finds that counsel's decision to omit a claim of ineffective trial counsel on appeal did not fall "outside the wide range of professionally competent assistance" and, therefore, cannot form the basis of a claim for ineffective appellate counsel under the Sixth Amendment. *Mayo,* 13 F.3d at 533. Moreover, Petitioner cannot show, under the standard set forth in *Strickland,* that appellate counsel's failure to raise the ineffective assistance of trial counsel claim was objectively unreasonable or that, if raised, there was a reasonable probability that his appeal would have been successful. For the reasons set forth above, this Court finds that Petitioner's claim as to appellate counsel's ineffectiveness is without merit, and, thus, that the state court did not unreasonably apply federal law in rejecting petitioner's claim.

IV. CONCLUSION

For the reasons set forth herein, this Court finds that the Petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. All of Petitioner's claims are plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 8, 2015
      Central Islip, New York

* * *

Petitioner is proceeding *pro se*. Respondent is represented by Kathleen M. Rice, District Attorney of Nassau County, by Jason R. Richards, 262 Old Country Road, Mineola, NY 11501.